SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION

OLF RS HOLDCO, LLC and RS 4 SPV LLC,

Plaintiffs,

- against -

RESS LIFE INVESTMENTS A/S

Defendant.

INDEX NO.______________

**SUMMONS**

Plaintiffs designate New York County as the place of trial

Venue is proper in this County pursuant to CPLR §§ 501, 503(a), and 509

**TO THE ABOVE-NAMED DEFENDANT:**

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiffs' attorneys within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York). In the event that you fail to answer or appear, judgment will be taken against you by default for the relief demanded herein.

Dated: New York, New York
September 4, 2026

Respectfully Submitted,

/s/ *Kevin J. O'Brien*

Kevin J. O'Brien
Sam Mirzai
**KING & SPALDING LLP**
1290 Avenue of the Americas, 14th Floor
New York, New York 10104
Tel.: (212) 556-2100
kobrien@kslaw.com
smirzai@kslaw.com
*Attorneys for Plaintiffs OLF RS Holdco, LLC and RS 4 SPV LLC*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION

OLF RS HOLDCO, LLC and RS 4 SPV LLC,

Plaintiffs,

- against -

RESS LIFE INVESTMENTS A/S

Defendant.

INDEX NO._____________

**COMPLAINT**

Plaintiffs OLF RS Holdco, LLC ("RS Holdco") and RS 4 SPV LLC ("RS 4" and, together with RS Holdco, the "OLF Parties" or "Plaintiffs"), by their attorneys, King & Spalding LLP, as and for their complaint against Defendant Ress Life Investments A/S ("Ress" or "Defendant"), allege upon knowledge as to themselves and otherwise upon information and belief as follows:

## NATURE OF ACTION

1. Plaintiffs purchased a portfolio of life insurance policies from Defendant Ress Life Investments through a carefully negotiated, arm's-length transaction between sophisticated parties. For its own business reasons, Ress chose to sell the insurance policies to Plaintiffs in a transaction where they would receive $165 million in cash paid in seven tranches, in a transaction Plaintiffs expected to result in a return of capital plus 13% annually. Plaintiffs would not have purchased these assets in an all-cash upfront transaction and in fact agreed to pay a further contingent amount only after achieving the 13% contracted return. Having accepted more than $144 million in payments over the course of a year and a half, Ress now appears to regret the bargain it made and is seeking pretextual grounds to terminate the agreement and reclaim the assets it sold—assets from which Plaintiffs expected to realize substantial profit over the life of the portfolio and that thus had substantial value in excess of the agreed purchase price.

2. The parties' bargain was straightforward. Pursuant to the April 28, 2025 Life Insurance Policy Purchase and Sale Agreement (the "PSA"), Ress agreed to sell a portfolio of life insurance policies to RS Holdco in a series of quarterly transactions, each effected through entitlement orders. The PSA was subsequently amended on August 11, 2025 by an Amendment, Consent and Reaffirmation (the "Amendment"), pursuant to which RS 4 assumed RS Holdco's obligations.

3. Following each of the first five payments by Plaintiffs, Ress dutifully effected entitlement orders. Ress also shared information about premium payments and maturity income received for the ongoing true-ups required under the agreement. But the sixth scheduled closing was different. Although Plaintiffs tendered the required $20,625,000 on August 18, 2026, Ress refused to transfer the corresponding life insurance policies. Days later, on August 21, 2026 (in a letter dated August 19, 2026), Ress purported to terminate the parties' agreement without any reference to the payment it had just received, without transferring title to the insurance policies for which Plaintiffs made that payment, and without any reference to the seventh closing scheduled for September 2026.

4. Ress's purported termination has no basis under the PSA. The sole contractual ground for termination under the PSA is a material default in the performance of obligations that is not cured within twenty days. But Plaintiffs cured the only performance-based default (a late quarterly payment) within the contractual cure period. The remaining alleged breaches—including a representation about the structure of RS 4 as a special purpose entity and an alleged failure to maintain access to sufficient available funds—are not "material defaults" in the performance of Plaintiffs' obligations. And even if they were, they would be subject to the PSA's exclusive indemnification remedy rather than termination.

5. Ress's conduct demonstrates that it had already decided to abandon its bargain and used pretextual claims of default to escape its obligations under the PSA. But Ress's refusal to perform, and its purported termination of the PSA, are themselves material defaults. Plaintiffs thus bring this action seeking (1) a declaratory judgment that the PSA remains valid and binding, and that Ress's termination is invalid; and (2) specific performance compelling Ress to transfer the life insurance policies to which Plaintiffs are entitled; or, alternatively, (3) damages for breach of contract.

## THE PARTIES

6. OLF RS Holdco, LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 437 Madison Avenue, 26th Floor, New York, New York 10022.

7. RS 4 SPV LLC ("RS 4") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 437 Madison Avenue, 26th Floor, New York, New York 10022.

8. Ress Life Investments A/S ("Ress") is a publicly traded company, listed on the NASDAQ Nordic exchange and organized under the laws of Denmark, with its principal place of business located at Nybrogade 12, DK-1203 Copenhagen K, Denmark.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over Defendant Ress pursuant to CPLR §§ 301 and 302(a)(1). In addition, Ress consented to the exclusive jurisdiction of the State of New York pursuant to Section 10.2(b) of the PSA, which provides that "EACH OF THE PARTIES HERETO IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY FEDERAL OR STATE COURT SITTING IN NEW YORK, NEW YORK, IN RESPECT OF ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT."

10. Venue is proper in this county pursuant to CPLR § 501, as Section 10.2(b) of the PSA provides for venue in this county, and pursuant to CPLR §§ 503 and 509, as Plaintiffs maintain their principal offices at 437 Madison Avenue, New York, New York 10022.

11. The PSA is governed by New York law pursuant to Section 10.2(a).

12. This action is properly assignable to the Commercial Division of this Court pursuant to 22 NYCRR § 202.70 because it involves a commercial dispute arising out of a commercial agreement with damages exceeding $500,000.

13. The parties have waived trial by jury pursuant to Section 10.2(c) of the PSA.

## FACTUAL ALLEGATIONS

### A. *The PSA and the Structure of the Transaction*

14. On April 28, 2025, RS Holdco (as "Purchaser") and Ress (as "Seller") entered into the PSA, under which Ress agreed to sell, and RS Holdco agreed to purchase, a portfolio of life insurance policies.

15. Ress disclosed the transaction in a press release and its public filings.

16. The total consideration for the policies consisted of (a) an initial payment, referred to in the PSA as the "MRA Purchase Price," of $41,250,000 (the "MRA Payment"), which had been previously paid by the Purchaser as part of a short-term repurchase arrangement to provide emergency liquidity to Ress, and (b) six quarterly installments of $20,625,000 each (each, a "Quarterly Payment Amount"), for an aggregate purchase price of approximately $165 million. The MRA Payment resulted in an early payment and the subsequent combining of tranches 1 and 2 of the originally negotiated eight-tranche structure.

17. The PSA established a structured transfer mechanism: on each Quarterly Payment Date, the Purchaser would pay Ress the Quarterly Payment Amount. The first payment in the series was the MRA Payment, which came in the first quarter of 2025, with subsequent Payment Dates

falling on the last day of each successive calendar quarter. Upon receipt of each Quarterly Payment Amount, Ress was obligated to execute an Entitlement Order and cause the transfer of the corresponding group of life insurance policies (each, a "Policy Group") to the Purchaser, as follows:

**SCHEDULE B**

**POLICY SCHEDULE**

| Quarterly Payment Date | Policy Closing Date | Policy Group | Portfolio Ownership Percentage |
|---|---|---|---|
| Effective Date | Effective Date | Policy Group 1 | 25% |
| June 30, 2025 | June 30, 2025 | Policy Group 2 | 37.5% |
| September 30, 2025 | September 30, 2025 | Policy Group 3 | 50.0% |
| December 30, 2025 | December 30, 2025 | Policy Group 4 | 62.5% |
| March 30, 2026 | March 30, 2026 | Policy Group 5 | 75.0% |
| June 30, 2026 | June 30, 2026 | Policy Group 6 | 87.5% |
| September 30, 2026 | September 30, 2026 | Policy Group 7 | 100.0% |

18. Section 4.1 of the PSA provides that, upon receipt of the Quarterly Payment Amount, the Seller "shall send . . . the completed and duly executed Entitlement Order" and deliver to the Purchaser electronic copies of the Sales Documentation Package and Policy Documents for the applicable Policy Group. Section 4.2 further provides that the Seller shall cause the transfer of such policies to the Purchaser.

19. The PSA also expressly sets forth the parties' respective termination rights. Section 6.2 provides that the Purchaser may terminate the Agreement upon, among other things, "material default by Seller in the performance of its obligations under this Agreement that Seller fails to cure within twenty (20) days." Section 6.3 provides that the Seller may terminate the Agreement upon, among other things, "material default by Purchaser in the performance of its obligations under this Agreement that Purchaser fails to cure within twenty (20) days." Accordingly, a party can only

exercise its termination right based on an alleged "material default" if the defaulting party fails to cure the material default within the twenty-day cure period.

20. The PSA is governed by New York law and provides for exclusive jurisdiction in New York courts. The PSA further provides that time is of the essence and that remedies are cumulative.

**B. *The August 2025 Amendment***

21. On August 11, 2025, the parties, along with Obra Longevity Fund, LP, entered into an Amendment, Consent and Reaffirmation (the "Amendment"). Pursuant to the Amendment, RS 4 assumed jointly and severally with RS Holdco all duties and obligations of the Purchaser under the PSA, and Obra Longevity Fund, LP provided an absolute, unconditional, and irrevocable parent guarantee of all of the Purchaser's obligations.

22. In the Amendment, RS 4 made certain representations and warranties to Ress, including a representation regarding its organizational structure as a special purpose entity (the "SPE Representation"). The Amendment also included reaffirmations of the representations made in the original PSA, including the representation in Section 9.13 of the PSA, which, as amended by the Amendment, requires the Purchaser to "at all times maintain sufficient cash or cash equivalents on hand or have readily available to it to satisfy all of its obligations as they come due" (the "Cash Covenant").

23. In connection with the transaction, and as is frequently used in acquisitions of this nature, Plaintiffs obtained financing for the transaction that was secured by some (but not all) of the purchased life insurance policies. The PSA contains no prohibition on such financing.

**C. *Plaintiffs Perform Their Obligations Under the PSA***

24. From June 30, 2025 through March 31, 2026, five quarterly closings were successfully completed under the PSA. On each occasion, the Purchaser tendered the Quarterly

Payment Amount and delivered a duly executed Entitlement Order, and Ress executed the Entitlement Order and caused the transfer of the corresponding Policy Group to Purchaser. The complete payment history is as follows:

| Date | Amount | Policy Group | Entitlement Order Status |
|---|---|---|---|
| Jan. 30, 2025 | $41,250,000 | Policy Group 1 (MRA) | Completed |
| June 30, 2025 | $20,625,000 | Policy Group 2 | Completed |
| Sept. 30, 2025 | $20,625,000 | Policy Group 3 | Completed |
| Jan. 2, 2026 | $11,000,000 | Policy Group 4a | Completed |
| Jan. 26, 2026 | $9,625,000 | Policy Group 4b | Completed |
| Mar. 31, 2026 | $10,312,500 | Policy Group 5a | Completed |
| May 1, 2026 | $10,312,500 | Policy Group 5b | Completed |
| Aug. 18, 2026 | $20,625,000 | Policy Group 6 | Ress failed to execute |
| **Total** | **$144,375,000** | | |

25. As the table above reflects, Plaintiffs paid a total of $144,375,000 to Ress over the course of the transaction. While certain payments were split into sub-payments or made shortly after the stated Quarterly Payment Date, Ress accommodated this timing and executed the respective Entitlement Orders without objection, establishing a course of dealing in which Ress accepted payments made within a reasonable time after the stated due date.

**D. *The Second Amendment Negotiation and Ress's Default Notice***

26. The fifth quarterly payment (the sixth overall payment), of $20,625,000, was due on June 30, 2026. In June and July 2026, the parties were actively negotiating a Second Amendment to the PSA that would have, among other things, combined the June and September

2026 quarterly payments into a single payment in August 2026. The proposed Second Amendment would have thus accelerated Ress's receipt of the September 2026 Quarterly Payment, further demonstrating Plaintiffs' commitment to the transaction. In reliance on the ongoing negotiations, the June 30, 2026 quarterly payment was not made on that date, as Plaintiffs understood that the parties were working toward a mutually agreeable modification of the PSA terms.

27. However, the Second Amendment negotiations stalled, and on July 29, 2026, Ress served a Notice of Material Default (the "Ress Default Notice"). During negotiations on the Second Amendment, Ress introduced the concept of a repurchase of all policies at their accrued value. Plaintiffs were assured by Ress that Ress did not in fact want to repurchase the portfolio. This supposedly innocuous insertion, however, foreshadowed the coming intentional default. The Ress Default Notice asserted three purported grounds for default: (a) a payment default under Section 2.7 of the PSA for the unpaid fifth Quarterly Payment due June 30, 2026; (b) an alleged breach of Section 9.13 of the PSA (i.e., the Cash Covenant); and (c) an alleged breach of the SPE Representation in the Amendment regarding the organizational structure of RS 4.

28. The Ress Default Notice triggered a twenty-day cure period under Section 6.3 of the PSA, which provides that the Seller may terminate the Agreement upon "material default by Purchaser in the performance of its obligations under this Agreement that Purchaser fails to cure within twenty (20) days."

29. Nevertheless, Ress purported to immediately "suspend performance" of its obligations under the PSA and demanded that Plaintiffs take steps to "unwind this transaction and restore Ress to the status quo ante." That demand revealed Ress's true objective: not to allow Plaintiffs to cure any alleged breach, but to escape a bargain it no longer wished to honor.

30. By terminating the PSA and retaining the Policies, Ress stands to recapture for itself

the substantial economic value of a portfolio that it sold to Plaintiffs at a material discount. Based on the approximately $165 million aggregate purchase price, Plaintiffs stood to acquire a portfolio valued substantially more than the purchase price and to otherwise realize substantial profit from the transaction. If Ress's termination is allowed to stand, Ress will have received more than $144 million in payments from Plaintiffs while retaining the very assets those payments were intended to purchase—and will capture for itself the valuable assets and potential profit that should have belonged to Plaintiffs.

**E. *Plaintiffs Negotiate with Ress in Good Faith***

31. Following receipt of the Ress Default Notice, the parties engaged in correspondence and discussions between July 30 and August 17, 2026. The substance of these communications demonstrates that Plaintiffs attempted to engage with Ress in good faith to resolve the dispute, while Ress sought to impose unreasonable conditions designed to frustrate any resolution.

32. On July 30, 2026, counsel for Plaintiffs sent a detailed response to the Ress Default Notice, explaining the circumstances of the delayed payment, categorically rejecting Ress's allegations of fraud, fraudulent inducement, and concealment, and expressing Plaintiffs' willingness to cure the payment default and continue performance under the PSA.

33. Between August 3 and August 17, 2026, the parties engaged in discussions and correspondence in an effort to resolve the dispute. During this period, Plaintiffs responded substantively and in good faith to each of Ress's communications, proposed a framework to facilitate a constructive resolution, and repeatedly followed up with Ress requesting engagement on the proposed framework. Ress, by contrast, imposed escalating and unreasonable demands as prerequisites to further discussion (demands going far beyond any contractual entitlements under the PSA), refused to engage on Plaintiffs' proposed framework, and ultimately accused Plaintiffs

of a "continuing lack of good faith"—despite Plaintiffs' consistent willingness to negotiate—thereby demonstrating that Ress had no genuine interest in allowing Plaintiffs to cure the alleged defaults or in reaching a negotiated resolution.

**F. *Plaintiffs' Timely Cure***

34. On August 18, 2026—within the twenty-day cure period outlined in Section 6.3 of the PSA—Plaintiffs wired the full $20,625,000 Quarterly Payment Amount to Ress. Simultaneously, Plaintiffs delivered to Ress's counsel the duly executed Entitlement Order for the transfer of Policy Group 6.

35. By doing so, Plaintiffs fully and timely cured the only performance-based default asserted by Ress within the contractual cure period. The cure payment had both legal and practical significance: legally, it extinguished any termination right Ress may have had based on the alleged payment default, while practically, it demonstrated that Plaintiffs had the ability and willingness to continue performing under the PSA. Having received the cure payment, Ress was obligated to execute the Entitlement Order and cause the transfer of Policy Group 6 to Plaintiffs.

**G. *Ress's Refusal to Transfer Policies and Wrongful Termination***

36. Nevertheless, Ress failed to execute the Entitlement Order for Policy Group 6 or otherwise cause the transfer of Policy Group 6 to Plaintiffs.

37. Throughout the parties' course of dealing before August 18, 2026, Ress executed the Entitlement Order corresponding to a quarterly payment either on the same day as the payment or by the next day.

38. On August 20, 2026—two days after Plaintiffs made their payment for Policy Group 6—Ress still had not executed the Entitlement Order and so Plaintiffs sent a Notice of Material Default to Ress pursuant to Section 6.2 of the PSA (the "Counter-Default Notice"). The Counter-Default Notice asserted that Ress's refusal to perform its ongoing obligations under the

PSA, including its refusal to execute the Entitlement Order and transfer Policy Group 6 after accepting Plaintiffs' August 18 payment, constitutes a material breach of the PSA.

39. The Counter-Default Notice demanded that Ress immediately perform its obligations under the PSA and provided Ress twenty days to cure its default. The Counter-Default Notice further reserved all rights and remedies available to Plaintiffs, including the right to seek specific performance, termination, indemnification, and monetary damages.

40. On August 21, 2026—just one day after Plaintiffs issued the Counter-Default Notice—Plaintiffs received from Ress a "Notice of Termination" (predated August 19, 2026) to Plaintiffs stating: "Please take notice that the Agreement is hereby terminated." Remarkably, the Notice of Termination made no mention whatsoever of the $20,625,000 payment that Ress had received on August 18 or of the Counter-Default Notice sent the day before, contained no analysis of whether Plaintiffs' cure was effective, and referenced only Ress's earlier Ress Default Notice.

41. Ress's "Notice of Termination" unequivocally communicated Ress's intention not to cure its material default and its intention to default in the same way with respect to Policy Group 7.

42. Under Sections 4.1 and 4.2 of the PSA, Ress was obligated to execute the Entitlement Order and cause the transfer of the Policies upon receipt of the Quarterly Payment Amount. But despite receiving Plaintiffs' $20,625,000 payment on August 18, Ress has refused, and continues to refuse, to execute the Entitlement Order and cause the transfer of the policies in Policy Group 6 to Plaintiffs. Ress's refusal to do so constitutes a material breach of the PSA.

43. Ress's refusal to perform its obligations under the PSA after receiving Plaintiffs' $20,625,000 payment constitutes a material breach of the PSA. It also confirms that the Notice of Termination was pretextual, as Ress already had decided to abandon the transaction and used the

alleged defaults as a pretext to escape a bargain it no longer wished to honor.

**H. *Ress's Termination Has No Contractual Basis***

44. Section 6.3 of the PSA permits the Seller to terminate only upon "material default by Purchaser in the performance of its obligations under this Agreement that Purchaser fails to cure within twenty (20) days." Ress's purported termination is ineffective because none of the three purported "defaults" asserted satisfy this standard.

45. First, the payment default was timely cured by Plaintiffs' August 18, 2026 payment, which was tendered within the twenty-day cure period under Section 6.3 of the PSA. Accordingly, the only default "in the performance of [Purchaser's] obligations" was fully remedied before Ress issued its notice of termination.

46. Second, the Cash Covenant requires the Purchaser to "maintain sufficient cash or cash equivalents on hand or have readily available to it" to satisfy its obligations. This disjunctive standard was satisfied at all relevant times. Moreover, to the extent the Purchaser had breached the Cash Covenant as of the date of the Ress Default Notice, which Plaintiffs deny, the breach was cured within twenty days of the Ress Default Notice, as demonstrated by, among other things, Plaintiffs' actual payment of the full $20,625,000 installment on August 18, 2026.

47. Moreover, Section 8.1 of the PSA provides that indemnification "shall be the exclusive remedies of Seller for a claim by Seller against Purchaser for a breach of the representations, warranties, covenants, or agreements made by the Purchaser herein." In other words, even if the Cash Covenant were somehow breached (and it was not) and/or such a breach was somehow not cured (and it was cured), the sole remedy available to Ress under the PSA would be indemnification for any "Losses" caused by the breach, not termination. And, moreover, Ress suffered no "Losses" caused by, arising out of, or in connection with any alleged breach of the Cash Covenant.

48. Third, the SPE Representation is, by definition, a representation; it is not a performance obligation. To be clear, Plaintiffs deny that the SPE Representation was breached in any way. But, even if Plaintiffs were to have breached the SPE Representation, it cannot serve as the basis for a termination right. Indeed, as with the Cash Covenant, the exclusive remedy for a breach of the SPE Representation is indemnification for any "Losses" caused by the breach, not termination. And, moreover, Ress suffered no "Losses" caused by, arising out of, or in connection with any alleged breach of the SPE Representation.

49. Because none of the above satisfy the standard set out in Section 6.3, Ress's purported termination lacks contractual basis. Moreover, the PSA contains no provision authorizing Ress to "suspend performance" of its obligations. Accordingly, Ress's purported suspension of performance, first announced in the Ress Default Notice and then reaffirmed in its Notice of Termination, was extra-contractual and of no legal effect.

50. In addition, since its purported suspension of performance in July 2026, Ress has failed and refused to perform its continuing obligations under Article 5 of the PSA, including its obligations to calculate and remit monthly true-up payments. The PSA contains no provision authorizing the suspension of these obligations.

**I. *Plaintiffs Suffer Harm from Ress's Conduct***

51. Ress's breaches of the PSA—its present failure to transfer Policy Group 6, its stated intention not to transfer Policy Group 7, and its failure to perform obligations under Article 5—have deprived and will deprive Plaintiffs of the benefits of their bargain under the PSA.

52. The policies at issue are all unique, non-fungible assets, and each is individually underwritten on a named insured, with individualized life-expectancy reports and actuarial profiles. The value of each policy depends on the specific mortality characteristics of the individual insured, and these factors cannot be replicated with substitute assets available on the open market.

Monetary damages are therefore inadequate to compensate Plaintiffs for the loss of the Policies.

53. Nevertheless, Plaintiffs have incurred substantial damages as a result of Ress's breaches.

54. Through the transaction, Plaintiffs would have acquired assets with a value substantially greater than the purchase price for those assets. Moreover, Plaintiffs reasonably expected to realize, through post-closing investment activity, substantial profits from the insurance policies they purchased or agreed to purchase. Based on the structure of the transaction and an expected annual return of up to 13%, Plaintiffs expected to realize substantial returns from Policy Groups 6 and 7. Plaintiffs' damages are thus no less than $68.5 million.

55. Plaintiffs also have incurred, and will continue to incur, legal fees and expenses in amounts yet to be determined as a result of Ress's breaches, including the expenses associated with this lawsuit—all of which are recoverable by Plaintiffs under the PSA.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION: DECLARATORY JUDGMENT

56. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 54 as if fully set forth herein.

57. An actual, justiciable controversy exists between Plaintiffs and Ress as to the validity of Ress's purported termination of the PSA, the continuing force and effect of the PSA, the effectiveness of Plaintiffs' August 18, 2026 cure payment, and the parties' respective rights and obligations under the PSA.

58. Ress's purported termination of the PSA has no contractual basis. The sole contractual ground for termination is a material default in the performance of Plaintiffs' obligations that is not cured within twenty days. Plaintiffs cured the only performance-based default within the cure period. The remaining purported defaults do not constitute defaults in the "performance

of [Purchaser's] obligations" within the meaning of Section 6.3, were cured, and/or are in any event subject to the PSA's exclusive indemnification remedy and cannot serve as the basis for termination of the PSA.

59. Plaintiffs are entitled to a declaratory judgment pursuant to CPLR § 3001 declaring: (a) that the PSA remains valid and binding and in full force and effect in accordance with its terms; (b) that Ress's purported termination of the PSA dated August 19, 2026 is invalid and of no force or effect; (c) that Plaintiffs' payment of $20,625,000 on August 18, 2026 constituted a timely and effective cure of any alleged payment default within the meaning of Section 6.3 of the PSA; and (d) that Ress's purported "suspension of performance" has no contractual basis and is of no force or effect.

**SECOND CAUSE OF ACTION: BREACH OF CONTRACT (SPECIFIC PERFORMANCE)**

60. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 58 as if fully set forth herein.

61. The PSA constitutes a valid and binding contract. Plaintiffs performed their obligations under the PSA by tendering the $20,625,000 Quarterly Payment Amount on August 18, 2026 and delivering the duly executed Entitlement Order for Policy Group 6.

62. Under Sections 4.1 and 4.2 of the PSA, upon receipt of the Quarterly Payment Amount, Ress was obligated to execute the Entitlement Order and cause the transfer of the corresponding Policy Group to the Purchaser.

63. Ress breached its obligations under the PSA by refusing to execute the Entitlement Order and refusing to cause the transfer of the Policies in Policy Group 6, while retaining Plaintiffs' $20,625,000 payment.

64. The life insurance policies at issue are unique, non-fungible assets. Each policy is

individually underwritten on a named insured, with individualized life-expectancy reports and actuarial profiles. The value of each policy depends on the specific mortality characteristics of the individual insured, and these factors cannot be replicated with substitute assets available on the open market. Monetary damages are therefore inadequate to compensate Plaintiffs for the loss of the Policies.

65. Plaintiffs are entitled to an order of specific performance compelling Ress to (a) execute and deliver the Entitlement Order for Policy Group 6 and cause the transfer of the Policies to RS 4; and (b) continue performance of all other obligations under the PSA.

**THIRD CAUSE OF ACTION: BREACH OF CONTRACT (DAMAGES)**

66. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 64 as if fully set forth herein.

67. Plaintiffs plead this Cause of Action in the alternative to the Second Cause of Action.

68. The PSA constitutes a valid and binding contract, and Plaintiffs fully performed all of their obligations under the PSA.

69. As alleged herein, Ress breached its obligations under the PSA by (a) refusing to execute the Entitlement Order and cause the transfer of Policy Group 6 to Plaintiffs despite accepting Plaintiffs' August 18 payment, and (b) purporting to terminate the PSA through its August 19, 2026 Notice of Termination.

70. As a direct and proximate result of Ress's breach, Plaintiffs have been damaged in an amount to be determined at trial, but not less than $68.5 million, representing at minimum the amounts Plaintiffs have been deprived of as a result of Ress's wrongful conduct, including (a) the fifth Quarterly Payment Amount, (b) the difference between the fifth and sixth Quarterly Payment Amounts and the actual value of Policy Groups 6 and 7, and (c) the loss of the substantial returns

that Plaintiffs expected to realize from such Policies.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant:

a. A declaratory judgment declaring that (a) the PSA remains valid and binding and in full force and effect in accordance with its terms; (b) Ress's purported termination of the PSA dated August 19, 2026 is invalid and of no force or effect; (c) Plaintiffs' payment of $20,625,000 on August 18, 2026 constituted a timely and effective cure of any alleged payment default within the meaning of Section 6.3 of the PSA; and (d) Ress's purported "suspension of performance" has no contractual basis and is of no force or effect;

b. Ordering specific performance compelling Ress to execute the Entitlement Order and transfer the life insurance policies in Policy Group 6 to RS 4;

c. In the alternative to specific performance, awarding compensatory damages in an amount to be determined at trial, but not less than $68,500,000;

d. Awarding pre- and post-judgment interest on all such damages;

e. Awarding reasonable costs and expenses incurred in this action, including attorneys' fees, in an amount to be determined at trial; and

f. Awarding such other, further, and different relief as the Court deems just and proper.

Dated: New York, New York
September 4, 2026

Respectfully Submitted,

/s/ *Kevin J. O'Brien*
Kevin J. O'Brien
Sam Mirzai
**KING & SPALDING LLP**
1290 Avenue of the Americas, 14th Floor
New York, New York 10104
Tel.: (212) 556-2100
kobrien@kslaw.com
smirzai@kslaw.com
*Attorneys for Plaintiffs OLF RS Holdco, LLC and RS 4 SPV LLC*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION

| | |
|---|---|
| OLF RS HOLDCO, LLC and RS 4 SPV LLC,<br>Plaintiffs,<br>- against -<br>RESS LIFE INVESTMENTS A/S<br>Defendant. | INDEX NO.____________<br>**COMMERCIAL DIVISION RULE 35 CORPORATE DISCLOSURE STATEMENT OF PLAINTIFFS** |

Pursuant to Rule 35 of the Rules of Practice for the Commercial Division, the undersigned counsel for Plaintiffs OLF RS Holdco, LLC and RS 4 SPV LLC makes the following disclosure:

No parent corporation or publicly held corporation owns 10% or more of OLF RS Holdco, LLC's stock.

No parent corporation or publicly held corporation owns 10% or more of RS 4 SPV LLC's stock.

Dated: New York, New York
September 4, 2026

Respectfully Submitted,

/s/ *Kevin J. O'Brien*
Kevin J. O'Brien
Sam Mirzai
**KING & SPALDING LLP**
1290 Avenue of the Americas, 14th Floor
New York, New York 10104
Tel.: (212) 556-2100
kobrien@kslaw.com
smirzai@kslaw.com
*Attorneys for Plaintiffs OLF RS Holdco, LLC and RS 4 SPV LLC*

King & Spalding

King & Spalding LLP
1290 Avenue of the Americas
14th Floor
New York, New York 10104
T: +1 212 556 2100
F: +1 212 556 2222
kslaw.com

**Kevin J. O'Brien**
*Partner*

T: 212-827-4088
kobrien@kslaw.com

September 8, 2026

**VIA UPS OVERNIGHT, U.S. MAIL, AND EMAIL**

Ress Life Investments A/S
ATTN: Anton Pozine
Nybrogade 12
DK-1203 Copenhagen K
Denmark
anton.pozine@resscapital.com

**Re: Action:** ***OLF RS Holdco, LLC and RS 4 SPV LLC v. Ress Life Investments A/S*, Index No. 161286/2026 (N.Y. Sup. Ct. N.Y. County)**

**Agreement: Life Insurance Policy Purchase and Sale Agreement, dated April 28, 2025, as amended by the Amendment, Consent and Reaffirmation dated August 11, 2025**

Dear Mr. Pozine:

On behalf of OLF RS Holdco, LLC and RS 4 SPV LLC ("Plaintiffs"), enclosed please find, in connection with the above-referenced Action, the Summons to Ress Life Investments A/S ("Ress"), the Complaint, the Notice of Electronic Filing, and the Commercial Division Rule 35 Corporate Disclosure Statement of Plaintiffs. Each of these documents is hereby being served on Ress pursuant to the manner set forth in the above-referenced Agreement.

Sincerely,

Kevin J. O'Brien

Enclosures

cc: Offit Kurman, P.A.
ATTN: Seth R. Gottlieb, Esq.
590 Madison Avenue, 6th Floor
New York, N.Y. 10022
sgottlieb@offitkurman.com
(*via UPS Overnight, U.S. Mail, and email*)

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF** New York: Commercial Division
---------------------------------------------------------------x
OLF RS HOLDCO, LLC and RS 4 SPV LLC,

Plaintiff/Petitioner,

- against - Index No. 161286/2026

RESS LIFE INVESTMENTS A/S

Defendant/Respondent.
---------------------------------------------------------------x

**NOTICE OF ELECTRONIC FILING**
**(Mandatory Case)**
(Uniform Rule § 202.5-bb)

**You have received this Notice because**:

1) The Plaintiff/Petitioner, whose name is listed above, has filed this case using the New York State Courts E-filing system ("NYSCEF"), and

2) You are a Defendant/Respondent (a party) in this case.

- **If you are represented by an attorney:**
  Give this Notice to your attorney. (Attorneys: see "Information for Attorneys" pg. 2).

- **If you are not represented by an attorney:**
  **You will be served with all documents in paper and you must serve and file your documents in paper, unless you choose to participate in e-filing.**

  **If you choose to participate in e-filing, you must have access to a computer and a scanner or other device to convert documents into electronic format, a connection to the internet, and an e-mail address to receive service of documents.**

  The **benefits of participating in e-filing** include:

  - serving and filing your documents electronically
  - free access to view and print your e-filed documents
  - limiting your number of trips to the courthouse
  - paying any court fees on-line (credit card needed)

**To register for e-filing or for more information about how e-filing works:**

- visit: www.nycourts.gov/efile-unrepresented or
- contact the Clerk's Office or Help Center at the court where the case was filed. Court contact information can be found at www.nycourts.gov

To find legal information to help you represent yourself visit www.nycourthelp.gov

**Information for Attorneys**
**(E-filing is Mandatory for Attorneys)**

An attorney representing a party who is served with this notice must either:

1) immediately record his or her representation within the e-filed matter on the NYSCEF site www.nycourts.gov/efile ; or

2) file the Notice of Opt-Out form with the clerk of the court where this action is pending and serve on all parties. Exemptions from mandatory e-filing are limited to attorneys who certify in good faith that they lack the computer hardware and/or scanner and/or internet connection or that they lack (along with all employees subject to their direction) the knowledge to operate such equipment. [Section 202.5-bb(e)]

For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: nyscef@nycourts.gov).

Dated: September 8, 2026

Kevin J. O'Brien
Name
KING & SPALDING LLP
Firm Name

1290 Avenue of the Americas, 14th Flo
Address
New York, NY 10104

(212) 556-2100
Phone

kobrien@kslaw.com
E-Mail

To: Ress Life Investments A/S

Attn: Anton Pozine

Nybrogade 12, DK-1203 Copen

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION

OLF RS HOLDCO, LLC and RS 4 SVP LLC,

Plaintiffs,

-against-

RESS LIFE INVESTMENTS A/S,

Defendant.

Index No.: 161286/2026

**AFFIRMATION OF SERVICE**

**KEVIN J. O'BRIEN**, an attorney duly admitted to practice law in the Courts of the State of New York, hereby affirms pursuant to CPLR 2106 as follows:

1. I am a partner at King & Spalding LLP, attorneys for Plaintiffs OLF RS Holdco, LLC and RS 4 SVP LLC ("Plaintiffs") in the above-captioned matter.

2. I am an attorney admitted to practice in New York and a non-party to this action.

3. On September 8, 2026, I caused to be served the Complaint, the Summons to Ress Life Investments A/S ("Ress"), the Notice of Electronic Filing, and the Commercial Division Rule 35 Corporate Disclosure Statement of Plaintiffs, pursuant to the manner set forth in the Life Insurance Policy Purchase and Sale Agreement, dated April 28, 2025, as amended by the Amendment, Consent and Reaffirmation dated August 11, 2025, through delivery by a nationally recognized overnight courier and U.S. Mail upon:

Ress Life Investments A/S
ATTN: Anton Pozine
Nybrogade 12
DK-1203 Copenhagen K
Denmark
UPS tracking #1ZA8138R0466136251

Offit Kurman, P.A.
ATTN: Seth R. Gottlieb, Esq.
590 Madison Avenue, 6th Floor
New York, N.Y. 10022
sgottlieb@offitkurman.com
UPS tracking #1ZA8138R0165838661

I caused a true copy of same, properly enclosed in a postpaid envelope, to be deposited in an official depository under the exclusive care and custody of the United States Postal Service within the State of New York, and a true copy of same, properly enclosed in a UPS envelope, to be deposited in an official depository under the exclusive care and custody of UPS within the State of New York, prior to the latest time designated by UPS for overnight delivery.

4. I affirm this 9th day of September, 2026, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, except as to matters alleged on information and belief and as to those matters I believe them to be true, and I understand that this document may be filed in an action or proceeding in a court of law.

Dated: New York, New York
September 9, 2026

Respectfully Submitted,

/s/ *Kevin J. O'Brien*
Kevin J. O'Brien
**KING & SPALDING LLP**
1290 Avenue of the Americas, 14th Floor
New York, New York 10104
Tel.: (212) 556-2100
kobrien@kslaw.com

*Attorneys for Plaintiffs OLF RS Holdco, LLC and RS 4 SPV LLC*

<< Return to **Search Results**

## 161286/2026 - New York County Supreme Court

Short Caption: **OLF RS HOLDCO, LLC et al v. RESS LIFE INVESTMENTS A/S**
Case Type: **Commercial - Contract**
Case Status: **Pre-RJI**
eFiling Status: **Partial Participation Recorded**

E-mail Participating Parties

Print Document List

**Narrow By Options**

Document Type:  Filed By:

Motion Info:  Filed Date:

thru

Document #:

Show Motion Folders ONLY

**Sort By:** Document #

| # | Document | Filed By | Status |
|---|---|---|---|
| 1 | SUMMONS | O'BRIEN, KEVIN JORDAN<br>Filed: 09/04/2026<br>*Received: 09/04/2026* | **Processed**<br>Confirmation Notice |
| 2 | COMPLAINT | O'BRIEN, KEVIN JORDAN<br>Filed: 09/04/2026<br>*Received: 09/04/2026* | **Processed**<br>Confirmation Notice |
| 3 | DISCLOSURE STATEMENT<br>*COMMERCIAL DIVISION RULE 35 CORPORATE DISCLOSURE STATEMENT OF PLAINTIFFS* | O'BRIEN, KEVIN JORDAN<br>Filed: 09/04/2026<br>*Received: 09/04/2026* | **Processed**<br>Confirmation Notice |
| 4 | AFFIRMATION/AFFIDAVIT OF SERVICE | O'BRIEN, KEVIN JORDAN<br>Filed: 09/09/2026<br>*Received: 09/09/2026* | **Processed**<br>Confirmation Notice |

<< Return to **Search Results**